**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:11cv326**

| | |
|---|---|
| **GREGORY CARTER, JOANNE CARTER, WILLIAM WRIGHT,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| ) | |
| **BANK OF AMERICA, N.A.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

Pending before the Court is the Motion to Dismiss [# 38]. This action stems from a loan agreement entered into between Plaintiffs and Defendant Bank of America, N.A. ("Bank of America") for the purchase of a lot in the River Rock subdivision ("River Rock"). Plaintiffs brought this action against Defendant Bank of America, N.A. ("Bank of America") asserting claims under the Interstate Land Sales Full Disclosure Act ("ILSA") and the North Carolina Unfair and Deceptive Trade Practices Act, as well as for negligent misrepresentation and fraud under North Carolina law. The District Court referred the motion to this Court for a memorandum and recommendation. The Court **RECOMMENDS** that the District Court **GRANT in part** and **DENY in part** the motion.

1

# I.    Factual Background

## A.    River Rock and the Net 5 Lot Loan Program

River Rock is a real estate development in the Highlands-Cashiers Plateau near Glenville, North Carolina.  (Pls.' Am. Compl. ¶ 2.)  Legasus of North Carolina, LLC ("Legasus") developed River Rock, which originally consisted of 3420 acres of undeveloped land.  (Id.)  River Rock was supposed to be a luxury development with amenities such as a Phil Mickelson golf course.  (Id. ¶¶ 4, 50-51.)  Legasus, however, began selling the lots before any of the infrastructure was built, including paved roads, sewer, water, and electricity.  (Id. ¶¶ 4, 52.)

As part of the marketing strategy for River Rock, Legasus hosted off-site sales presentations in other states, including New Jersey.  (Id. ¶ 55.)  Defendant Bank of America also participated in these presentations.  (Id.)  For example, a Bank of America employee traveled to one sales presentation in New Jersey, where she passed out business cards, told the individuals attending the presentation to call her if they needed assistance financing the purchase of a lot at River Rock, and encouraged individuals to buy lots at River Rock.  (Id. ¶¶ 55-56.)  This employee also stated that she would invest in River Rock if she could, and that she thought River Rock was a good investment.  (Id. ¶ 56.)  In addition, Bank of America participated in launch events for River Rock by setting up booths to meet with

prospective purchasers of lots.  (<u>Id.</u> ¶ 18.)

In order to promote its financial products and compete with other banks for the loans for River Rock lots, Defendant Bank of America developed the Net 5 Lot Loan Program.  (<u>Id.</u> ¶¶ 6, 8, 16, 20-22.)  This loan program allowed purchasers of lots at River Rock to elect to make interest only payments for the first five years of the loan and to finance between 90-95% of the lot purchase price.  (<u>Id.</u> ¶¶ 7, 17.)  In addition, Legasus and Defendant Bank of America agreed to a system where Legasus would transfer the purchaser's down payment to Defendant Bank of America so that the down payment could be held in a separate bank account, and Defendant Bank of America could use the down payment to make the initial mortgage payments for the individual purchaser.  (<u>Id.</u> ¶ 23.)  This program allowed the purchasers of lots at River Rock to purchase a lot for 5-10% down but not have to make mortgage payments for approximately eighteen months.   (<u>Id.</u> ¶¶ 17, 20.)  Defendant Bank of America designed the Net 5 Lot Loan Program to increase loan volume.  (<u>Id.</u> ¶ 16.)

**B.      Plaintiffs Purchase of a Lot at River Rock**

At some point, real estate broker Paul Tarins of Buy Vacation Condos introduced Plaintiff Gregory Carter to River Rock.  (<u>Id.</u> ¶¶ 10, 62.)   Tarins then introduced Plaintiff Gregory Carter to Earl Oxendine, who was a loan officer at

Defendant Bank of America, to discuss financing of a lot. (Id. ¶¶ 62-64.) During the first conversation between Oxendine and Plaintiff Gregory Carter, Oxendine stated that he was actively working on a number of loans for Tarins's investors who were purchasing lots at River Rock, that Legasus was providing discounted prices to Phase One purchasers at River Rock in order to encourage sales, that Plaintiff Gregory Carter had built in profit in the lot he was considering, and that the lot would continue appreciating over the next year. (Id. ¶ 64.) In addition, Plaintiffs contend that Oxendine made the following comments to Plaintiff Gregory Carter prior to his purchase of a lot at River Rock:

(1) that Plaintiff Gregory Carter could sell the lot for a large profit before he had to make a payment on the loan;

(2) that Bank of America did preconstruction loans for Tarins in other communities, and that real estate investing under the special loan program was a great deal;

(3) that Tarins was a good guy, and Oxendine could vouch for him;

(4) that Tarins had a good track record, and that Plaintiff Gregory Carter would benefit from working with Tarins just as other had benefitted;

(5) that the first lots at River Rock were being offered to Tarins's buyers, and that Plaintiff Gregory Carter had the advantage of being part of

this group;

(6)    in response to a statement by Plaintiff Gregory Carter that the lot did not seem like a bargain, Oxendine stated that the lots were underpriced and that Tarins's buyers did very well when they resold lots;

(7)    that within a year there would be several price increases on the lots being sold by Legasus, and that Plaintiff Gregory Carter's lot would go up in value with the developer's lots;

(8)    that the lots at River Rock would rise more dramatically than average communities because River Rock was high end;

(9)    that the marketing agents for Legasus would re-sell the lots of Tarins's buyers first;

(10)   that Plaintiff Gregory Carter would sell his lot before the funds from the down payment that were used to pay the first mortgage payments were depleted.

(Id. ¶¶ 65-72.)  Plaintiffs contend that these statements were made while Oxendine was performing his duties as a loan officer for Defendant Bank of America, that the statements were false, and that they were made with the intent to deceive the Plaintiffs.  (Id. ¶¶ 5, 13, 48, 105, 107, 108, 112.)  In addition, Plaintiffs contend

that Oxendine knew at the time that Legasus was not providing the infrastructure and amenities promised to purchasers of lots at River Rock.   (Id. ¶¶ 12, 53-54.)

After Oxendine made the alleged misrepresentations, Plaintiffs purchased Lot 38 in River Rock on February 27, 2006, for $299,999.00.  (Id. ¶ 61.)  Plaintiffs financed the purchase of the lot by taking out a three year interest only loan with Defendant Bank of America.  (Id. ¶¶ 65-73.)  Plaintiffs made a down payment of $29,990 to Legasus for the lot, which Legasus transferred into an account at Defendant Bank of America to use for the mortgage payments until the funds were depleted.  (Id. ¶ 74.)

At closing, Plaintiffs paid Homefocus $300.00 for the appraisal of the lot. (Id. ¶ 75.)  Homefocus is an entity that is affiliated with Defendant Bank of America.  (Id. ¶¶ 30, 75.)  Although Plaintiffs never received a copy of the appraisal (id. ¶ 76), the lot was appraised at $300,000.00 based on the price of other lots at River Rock that had recently closed (id. ¶ 78).   Plaintiffs contend that Defendant Bank of America used Homefocus for its appraisals because it knew that the appraisers would appraise the lots at a value necessary for the loan to close, regardless of the actual value of the lots.  (Id. ¶ 30.)   Put simply, Plaintiffs contend that as a result of the actions of Defendant Bank of America, including the use of inflated appraisals, the sales prices of the lots at River Rock were artificially

inflated. (Id. ¶¶ 31, 35-37.)

After closing on the lot, Plaintiffs were unable to sell the lot prior to depleting the down payment funds, and Plaintiffs had to make payments on the loan. (Id. ¶ 79.) Plaintiffs contend that local realtors would not list the lot because River Rock was not developed and was worth only a fraction of the price paid by Plaintiffs in 2006. (Id.)

## C.     The Claims Asserted in the Amended Complaint

After the collapse of River Rock, Plaintiffs brought this action against Defendant Bank of America. Count One asserts a claim pursuant to the ILSA. Count Two asserts a claim pursuant to the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"). Count Three assets a claim for negligent misrepresentation based on the alleged misrepresentations of Oxendine. Finally, Count Four asserts a claim for fraud. Defendant Bank of America moves to dismiss the Amended Complaint in its entirety. Defendant's motion is now properly before this Court for a memorandum and recommendation to the District Court.

## II.     Legal Standard

The central issue for resolving a Rule 12(b)(6) motion is whether the claims state a plausible claim for relief. See Francis v. Giacomelli, 588 F.3d 186, 189 (4th

Cir. 2009). In considering Defendant's motion, the Court accepts the allegations in the Amended Complaint as true and construes them in the light most favorable to the Plaintiffs. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009); Giacomelli, 588 F.3d at 190-92. Although the Court accepts well-pled facts as true, it is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement . . . ." Consumeraffairs.com, 591 F.3d at 255; see also Giacomelli, 588 F.3d at 189.

The claims need not contain "detailed factual allegations," but must contain sufficient factual allegations to suggest the required elements of a cause of action. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007); see also Consumeraffairs.com, 591 F.3d at 256. "[A] formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S. Ct. at 1965. Nor will mere labels and legal conclusions suffice. Id. Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

The Amended Complaint is required to contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974; see also Consumeraffairs.com, 591 F.3d at 255. "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949; see also Consumeraffairs.com, 591 F.3d at 255. The mere possibility that a defendant acted unlawfully is not sufficient for a claim to survive a motion to dismiss. Consumeraffairs.com, 591 F.3d at 256; Giacomelli, 588 F.3d at 193. Ultimately, the well-pled factual allegations must move a plaintiff's claim from possible to plausible. Twombly, 550 U.S. at 570, 127 S. Ct. at 1974; Consumeraffairs.com, 591 F.3d at 256.

Where, a party's allegations sound in fraud, however, the allegations must also satisfy the heightened pleading standards of Rule 9. Cozzarelli v. Inspire Pharmaceuticals Inc., 549 F.3d 618, 629 (4th Cir. 2008); Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007). Rule 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9 applies not only to claims asserting common law fraud, but to all claims where the allegations have the substance of fraud. Cozzarelli, 549 F.3d at 629. A claim is subject to dismissal under Rule 12(b)(6) for failure to state a claim if it does not comply with Rule 9(b). Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783 n.5

(4th Cir. 1999).

## III. Analysis

## A. Implausibility

As an initial matter, Defendant contends that all of the claims fail as a matter of law because the scheme underlying each of the claims is so contrary to its business interests as to be implausible as a matter of law and, thus, fails to comply with the requirements of Twombly and Iqbal. In support of its position, Defendant relies on Feeley v. Total Realty Mgmt., 60 F. Supp. 2d 700 (E.D. Va. 2009)[1] and Goldstein v. Bank of America, No. 1:09cv329, 2010 WL 1252641 (W.D.N.C. Jan. 10, 2010) (Howell, Mag. J.). Both this Court and a District Court in the United States District Court for the Western District of North Carolina, however, have recently rejected substantially similar arguments in several cases. See Synovus Bank v. Karp, 887 F. Supp. 2d 677 (W.D.N.C. 2012) (Reidinger, J.) (rejecting bank's argument that the counterclaims were subject to dismissal because the counterclaims were not plausible); Synovus Bank v. Coleman, 887 F. Supp. 2d 659 (W.D.N.C. 2012) (Reidinger, J.) (same); Synovus Bank v. Okay Props., LLC, Civil No. 1:11cv330, 2012 WL 3745280 (W.D.N.C. Aug. 28, 2012) (Reidinger, J.) (same).

---

[1] The Court notes that some Courts have rejected the Feeley Court's interpretation of the plausibility standard as set forth in Twombly and Iqbal. See e.g., Dobyns v. U.S., 91 Fed. Cl. 412, 424-428 (Fed. Cl. 2010).

As the Court explained in <u>Karp</u>:

> As the events of the recent economic crisis have demonstrated, financial institutions do not always make the most prudent business decisions, and they sometimes may accept what would otherwise appear to be unreasonable economic risks for the sake of immediate, short-term profitability. Thus, while the Bank's conduct, as alleged by the Defendants, may not appear to have been the most prudent course of action for the Bank to take in terms of its long-term business interests, that certainly does not mean that such conduct is not plausible as a matter of law. Indeed . . . Synovus Bank would not be the first corporation in the history of modern economics to undertake an action that carried substantial risk to its long term financial viability in order increase short profits or revenue.

887 F. Supp. 2d at 686 (internal quotations omitted).   Like <u>Karp</u>, <u>Coleman</u>, and <u>Okay Props.</u>, Plaintiffs have pled sufficient factual allegations in the Amended Complaint to state claims that are plausible on their face; the factual allegations alleged in the Amended Complaint are not so implausible as to warrant the dismissal of all the claims asserted in the Amended Complaint.  Accordingly, the Court **RECOMMENDS** that the District Court deny the Motion to Dismiss to the extent it seeks to dismiss the Amended Complaint in its entirety for failure to plead claims that are plausible as a matter of law.

**B.    The Statute of Limitations**

Plaintiffs purchased the River Rock lot on February 27, 2006.  (Pls.' Am. Compl. ¶ 61.)  Plaintiffs, however, did not bring this action until December 8, 2011, over five years after closing.  Defendant contends that all of the claims

asserted in the Amended Complaint are barred by the applicable statute of limitations.

The statute of limitations for a claim brought pursuant to the North Carolina Unfair and Deceptive Trade Practices Act is four years. N.C. Gen. Stat. § 75-16.2. Ordinarily, a UDTPA claim accrues and the statute of limitations begins to run when the alleged violation occurs. <u>Hinson v. United Fin. Servs., Inc.</u>, 473 S.E.2d 382, 387 (N.C. Ct. App. 1996). Where the UDTPA claim is based on fraud, however, the claim accrues when the plaintiff discovers the fraud or when the plaintiff should have discovered the fraud with the exercise of reasonable diligence. <u>Nash v. Motorola Commc'ns & Elecs., Inc.</u>, 385 S.E.2d 537, 538 (N.C. Ct. App. 1989); <u>Wysong & Miles Co. v. Emp'rs of Wausau</u>, 4 F. Supp. 2d 421, 433 (M.D. N.C. 1998). North Carolina courts "have determined that a plaintiff cannot simply ignore facts which should be obvious to him or would be readily discoverable upon reasonable inquiry." <u>S.B. Simmons Landscaping & Excavating, Inc. v. Boggs</u>, 665 S.E.2d 147, 161-62 (N.C. Ct. App. 2008). "Whether a plaintiff exercised due diligence in discovering fraud is usually a question of fact . . . but this question may be determined as a matter of law where the plaintiff clearly had both the capacity and opportunity to discovery the fraud." <u>Wysong & Miles</u>, 4 F. Supp. 2d at 433; <u>see</u> <u>also</u> <u>State Farm Fire & Cas. Co. v. Darsie</u>, 589 S.E.2d 391,

397 (N.C. Ct. App. 2003) ("where the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of reasonable diligence is established as a matter of law.").

Plaintiffs' negligent misrepresentation and fraud claims are subject to a shorter three year statute of limitations. N.C. Gen. Stat. § 1-52(5) (negligent misrepresentation); N.C. Gen. Stat. § 1-52(9)(fraud); Barger v. McCoy Hillard & Parks, 488 S.E.2d 215, 223-24 (N.C. 1997); Ussery v. Branch Banking & Trust Co., 743 S.E.2d 650, 654 (N.C. Ct. App. 2013); Guyton v. FM Lending Servs., Inc., 681 S.E.2d 465, 470-71 (N.C. Ct. App. 2009). A fraud claim accrues on the day the plaintiff discovers the fraudulent act or should have discovered the act through the exercise of reasonable diligence, irrespective of how much time has actually passed. N.C. Gen. Stat. § 1-52(9); Birtha v. Stonemor, N.C., LLC, 727 S.E.2d 1, 9 (N.C. Ct. App. 2012); Darsie, 589 S.E.2d at 396. A claim for negligent misrepresentation accrues when the plaintiff suffers harm because of the misrepresentation and the plaintiff discovers the misrepresentation. Barger, 488 S.E.2d at 224; Trantham v. Michael L. Martin, Inc., 745 S.E.2d 327, 334 (N.C. Ct. App. 2013); Guyton, 682 S.E.2d at 470-71.[2]

---

2  Because Defendant only addresses North Carolina law in making its statute of limitations argument, the Court will assume for purposes of ruling on this motion that North Carolina law applies to the tort claims. At summary

Finally, an ILCA claim, such as the one asserted by Plaintiffs in the Amended Complaint, is also subject to a three year statute of limitations. 15 U.S.C. § 1711(2); 15 U.S.C. § 1703(a)(2)(A)-(C). The three year period begins to run from the date of discovery of the violation or when Plaintiffs should have discovered the violation through the exercise of reasonable diligence. 15 U.S.C. § 1711(a)(2).

Although Defendant may be correct that some of the potential claims asserted in the Amended Complaint are barred by the applicable statute of limitations, this Court cannot say on the record before it at this time that all the claims are barred as a matter of law. Based on the factual allegations in the Amended Complaint, the Court cannot find as a matter of law that Plaintiffs could have discovered each of the alleged fraudulent acts and statements through the exercise of reasonable diligence. The issue of when Plaintiffs actually discovered the alleged fraud or when they should have discovered the alleged fraud through the exercise of reasonable diligence will depend on the evidence in the record and will either be questions of fact for the jury or issues for the Court to resolve at summary judgment based on the actual evidence in the record. See generally Spears v. Moore, 551 S.E.2d 483, 485 (N.C. Ct. App. 2001); North Carolina Nat'l

---

judgment, however, the parties should be prepared to address the choice of law issues as to all the tort claims.

Bank v. Carter, 322 S.E.2d 180, 184-85 (N.C. Ct. App. 1984).

Again, this is not to say that Defendant may not ultimately prevail on its statute of limitations argument, only that the Court is unable to find as a matter of law that all the claims are barred by the applicable statute of limitations based only on the factual allegations in the Amended Complaint. The factual allegations in the Amended Complaint do not demonstrate without conflict that Plaintiffs had the capacity and opportunity to discover each of the alleged fraudulent acts as set forth in the Amended Complaint. See Darsie, 589 S.E.2d at 397. The Court **RECOMMENDS** that the District Court deny without prejudice the Motion to Dismiss on statute of limitations grounds.

### C.     The ILCA Claim

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778, 96 S. Ct. 2430, 2433-34 (1976). The ILSA is based on the same notion of full disclosure that permeates the Securities Act of 1933. Id. "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." Burns v. Duplin Land Dev., Inc., 621 F.

Supp. 2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a).  15 U.S.C. § 1709; Burns, 621 F. Supp. 2d at 301; Nahigian v. Juno Loudoun , LLC, 684 F. Supp. 2d 731, 742 (E.D. Va. 2010) ("A private cause of action arises under the Act only against a 'developer or agent'").  Section 1701 defines a "developer" as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision . . . ."  15 U.S.C. § 1501(5). The statute does not limit the definition of a developer to the original entity that subdivides undeveloped land and offers lots for sale.  U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc., 64 F.3d 920, 925 (4th Cir. 1995); Olsen v. Lake Cnty. Inc., 955 F.2d 203, 205 (4th Cir. 1991).  An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; but shall not include an attorney at law whose representation of another person consists solely of rendering legal services . . . ."  15 U.S.C. § 1501(6).

Bank of America contends that the ILSA claim is subject to dismissal because it is not a developer or agent within the meaning of the statute.  As a general rule, lending institutions acting in the ordinary course of their business are

16

not considered developers within the meaning of the ILSA. See Karp, 887 F. Supp. 2d at 689; Coleman, 887 F. Supp. 2d at 667; Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Hammar v. Cost Control Mktg. & Sales Mgmt. of Va., Inc., 757 F. Supp. 698, 702 (W.D. Va. 1990); Kenneally v. Bank of Nova Scotia, 711 F. Supp. 2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases). "A bank . . . which merely finances the various lot sales and has no involvement in the development, marketing, or sale of the land unless foreclosure becomes necessary, is certainly acting in the ordinary course of business." Hammar, 757 F. Supp. at 702. A commercial bank such as Bank of America, however, may step outside of its ordinary role as a lending institution and be considered a developer under the ILSA where it directly or indirectly markets property for sale. See 15 U.S.C. § 1501(5); Cumberland, 621 F.2d at 251; Hammar, 757 F. Supp. at 702; Kenneally 711 F. Supp. 2d at 1192; Timmreck v. Munn, 433 F. Supp. 396 (N.D. Ill. 1977); Thompson v. Bank of America, No. 7:09cv89, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011).

As the United States District Court for the Western District of Virginia explained in Hammar:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort. It is participating to an acceptable degree in the marketing of the project.

It is has gone beyond its function as a commercial bank to lot purchasers.

757 F. Supp. at 702-3. In <u>In re</u> <u>Total Realty Mgmt., LLC</u>, the Fourth Circuit reached a similar conclusion, holding that the "Interstate Land Sales Act's fraud provision encompasses entities that participated in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." 706 F.3d 245, 253 (4th Cir. 2013).

Here, the Court finds that Plaintiffs have plead sufficient factual allegations to state a claim against Defendant Bank of America. Although Defendant is correct that allegations that its employees attended the sales promotion events for River Rock and promoted its loan products to potential lot purchasers are insufficient to state a claim under the ILSA, the Amended Complaint goes a step further and specifically alleges that Defendant's employees participated in multiple sales presentations by encouraging individuals to buy lots at River Rock. (<u>Id.</u> ¶ 55.) Such allegations go beyond Bank of America's role as a commercial bank providing loans for a new real estate development and constitute advertising and promotional efforts to help Legasus sell lots at River Rock. Although minimal, the factual allegations are sufficient to state a claim under the ILSA, and the Court **RECOMMENDS** that the District Court **DENY** the Motion to Dismiss as to the ILSA claim.

**D.    Fraud**

The elements of fraud under North Carolina law are: (1) the false representation or concealment of a material fact; (2) that is reasonably calculated to deceive; (3) is made with the intent to deceive; (4) does in fact deceive the plaintiff; and (5) damages that result from the false representation or concealment. Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007) (applying North Carolina law).  In addition, a plaintiff must reasonably rely on the false representations.  Id.  North Carolina courts, however, recognize that the doctrine of reasonable reliance will prevent a plaintiff from recovering under a theory of fraud in some circumstances.  Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 341 (4th Cir. 1998).   "Specifically, if a plaintiff has an alternative source for the information that is alleged to have been concealed from or misrepresented to him, his ignorance or reliance on any misinformation is not reasonable."  Id.

Generally, a representation that is only a statement of one's opinion cannot constitute a false representation for purposes of a fraud claim.  Myrtle Apartments, Inc. v. Lumbermen's Mut. Cas. Co., 127 S.E.2d 759, 761 (N.C. 1962) (holding that an engineer's report recommending that a boiler be replaced after the heating season could not constitute fraud); Leftwich v. Gains, 521 S.E.2d 717, 722-23 (N.C. Ct. App. 1999); compare Meyers & Chapman, Inc. v. Thomas G. Evans,

Inc., 374 S.E.2d 385, 389-90 (N.C. 1988) (holding that a representation in a statement from a contractor that work had been completed and payment was due was not an opinion). "However, the general rule that no one is liable for an expression of opinion is not a hard and fast rule; . . . it does not apply to the dishonest expression of an opinion not actually entertained.'" Leftwich, 521 S.E.2d at 723 (quoting 37 C.J.S. *Fraud* § 13 (1997)). As the Court of Appeals in Leftwich explained, "a statement purporting to be opinion may be the basis for fraud if, at the time it is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Id. (emphasis added); see also Karp, 887 F. Supp. 2d at 687-88 (denying motion to dismiss fraud claims based on statements by a loan officer to prospective purchasers as to the value of lots at River Falls); Olympus Managed Health Care, Inc. v. Am. Housecall Physicians, Inc., 662 F. Supp. 2d 427, 438(W.D.N.C. 2009) (Conrad, C.J.); Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07cv275, 2011 WL 1134453, at *6 (E.D.N.C. Jan. 25, 2011) ("But a purported opinion or promissory representation may support a fraud claim if, at the time the statement is made, the speaker actually believes to the contrary and makes the statement with an intent to deceive the other party.").

Plaintiffs allege a number of representations and omissions that Oxendine

made to them prior to closing on the lot, which they contend were made with the intent to deceive.  In addition, Plaintiffs allege that they relied on these allegedly false representations to their detriment in deciding to purchase the lot at River Rock.  The Amended Complaint specifically identifies who made the statements, to whom they were made, and both the context and approximate time frame of the statements, satisfying the requirements of Rule 9(b).  As the Court explained in Karp, even if these statements are expressions of opinions by Oxendine, Plaintiffs can still prevail if they can show that when Oxendine made the statements, he held an opinion contrary to the one he expressed, and that he did so with the intent to deceive Plaintiffs into purchasing the lots.  See Karp, 887 F. Supp. 2d at 687-88; Olympus Managed Health Care, 662 F. Supp. 2d at 438; Leftwich, 521 S.E.2d at 723.

Moreover, some of the alleged statements by Oxendine constitute more than opinions as to the value of property.  For example, Plaintiffs allege that Oxendine told them that within a year there would be several price increases on the lots being sold by Legasus and that Plaintiff Gregory Carter's lot would go up in value with the developer's lots, that Plaintiffs were receiving the lot at a discount because they were purchasing the lot during Phase One, and that that the marketing agents for Legasus would re-sell the lots of Tarins's buyers first.  Just like some of the

statements by the loan officer in <u>Karp</u>, these statements by Oxendine are based upon existing fact rather than "based upon opinions or predictions of future actions or outcomes." <u>Karp</u>, 887 F. Supp. 2d at 678. The statements that Legasus would increase the price of the developer lots within a year, that the Phase One lots were sold at a discount, and that the marketing agents would sell the lots of Tarin's buyers first are statements of existing fact, not opinions as to the estimated value of a property. And if any of these statements were in fact false when made, were made with the intent to deceive, Plaintiffs relied on the statements in deciding to purchase the property, and Plaintiffs suffered damages as a result – as alleged in the Amended Complaint – then Plaintiffs could potentially prevail on their fraud claim.

Finally, in contrast to Defendant's contention to the contrary, the Amended Complaint sufficiently alleges that Plaintiffs relied on the allegedly false statements made by Oxendine, and, ultimately, whether or not Plaintiffs' reliance on the statements of Oxendine was reasonable is a fact intensive inquiry that will depend on the evidence in the record and the testimony of the parties. As the cases relied upon by Defendant demonstrates, the issue of whether a plaintiff's reliance was reasonable is an issue for summary judgment based upon the evidence in the record, as opposed to whether the complaint states a claim for relief. <u>See</u> <u>Sunset</u>

Beach Dev., LLC v. AMEC, Inc., 675 S.E.2d 46 (N.C. Ct. App. 2009); Hearne v. Statesville Lodge No. 678, 546 S.E.2d 414 (N.C. Ct. App. 2001); Helms v. Holland, 478 S.E.2d 513, 633-34 (N.C. Ct. App. 1996).[3] In addition, this is not a case where all the alleged misrepresentations involved a condition of the property that could easily have been discovered through an inspection of the property. See e.g., Hearne, 546 S.E.2d at 415-16 (purchaser of property relied on representation of defendant regarding septic system without conducting an independent investigation of the property). Put simply, whether Plaintiffs reasonably relied on the statements made by Oxendine is a question for the Court to resolve at summary judgment, not on a motion to dismiss because Plaintiffs have sufficiently alleged factual allegations stating a fraud claim.[4] Although Plaintiffs will bear a heavy burden of demonstrating the ultimate viability of the fraud claim, the Amended Complaint sets forth a valid claim for fraud and is not subject to dismissal pursuant to Rule 12(b)(6). The Court **RECOMMENDS** that the District Court deny the Motion to Dismiss as to the fraud claim.

---

3  This is not to say that the Court would never dismiss a case where the factual allegations demonstrate that, as a matter of law, a plaintiff could not have reasonably relied on fraudulent statement, only that this is not such a case.
4  The Court also notes that it does not hold that each of the alleged misrepresentations by Oxendine could separately support a fraud claim. For example, if the extent of the fraud allegations were that Oxendine allegedly misrepresented to Plaintiffs that the infrastructure at River Rock was currently being built, then such a claim would fail because a simple visit to the development by Plaintiffs or an inspection by a third party could have revealed whether the infrastructure was being built or not. In contrast, if the allegation is that Oxendine knew that Legasus never had any intention to build the infrastructure in the manner represented, then an inspection of the property would not have revealed the falsity of the misrepresentation and, thus, reliance on the fraudulent statement would be reasonable. The Court merely finds that at least one of the alleged statements by Oxendine is sufficient to state a fraud claim against Defendant, not that each statement is separately sufficient. And the Amended Complaint asserts only a single fraud claim.

### E.  Negligent Misrepresentation

Under North Carolina law, the tort of negligent misrepresentation requires that the plaintiff: (1) justifiably rely; (2) to plaintiff's detriment; (3) on information prepared without reasonable care; (4) by an individual owing the plaintiff a duty of care.  Guyton, 681 S.E.2d at 478;  Hospira, 671 S.E.2d at 12; see also Geo Plastics v. Beacon Dev. Co., No. 10-1656, 2011 WL 2213718, at *3 (4th Cir. Jun. 8, 2011) (applying North Carolina law) (unpublished).

Fatal to Plaintiffs' negligent misrepresentation claim is the fact that the Amended Complaint fails to allege factual allegations supporting an essential element of a negligent misrepresentation claim - that Defendant Bank of America and its loan officers owed Plaintiffs a duty of care related to the alleged misrepresentations.  The alleged misrepresentations in this case do not involve representations or omissions regarding the terms and conditions of the loans offered by Bank of America.  Instead, Plaintiffs allege that Oxendine made numerous misrepresentations regarding the value of the lots, the progress of the development of River Rock, future price increases for the lots still held by Legasus, and the potential for Defendants to re-sell the lots.  Under North Carolina law, however, the banker-customer or lender-debtor relationship generally does not give rise to a fiduciary relationship.  See Branch Banking and Trust Co. v.

Thompson, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992) ("[P]arties to a contract do not thereby become each other's fiduciaries; they generally owe no special duty to one another beyond the terms of the contract and the duties set forth in the U.C.C."); Lassiter v. Bank of North Carolina, 551 S.E.2d 920, 922-23 (N.C. Ct. App. 2001); Camp v. Leonard, 515 S.E.2d 909, 913 (N.C. Ct. App. 1999) ("[A] lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party."); Wagner v. Branch Banking and Trust Co., 179 N.C. App. 436, 2006 WL 2528495, at *2 (N.C. Ct. App. 2006) (unpublished) ("[T]his court has acknowledged that a lender has a duty to perform those responsibilities specified in a loan agreement, but has declined to impose any duty beyond those expressly provided for in the agreement."); Karp, 887 F. Supp. 2d at 690. Moreover, the Amended Complaint fails to allege facts supporting any type of special relationship between Oxendine and Plaintiffs beyond that of the typical loan officer-customer that might give rise to a duty of care above and beyond that typical of the debtor-creditor or banker-customer relationship. See generally Thompson, 418 S.E.2d at 699 (recognizing that under the proper circumstances the bank-customer relationship could give rise to fiduciary relationship); Karp, 887 F. Supp. 2d at 690 (dismissing substantially similar claims). Although Plaintiffs attempt to fabricate a duty of care based on the same statements by Oxendine that

form the basis of the fraud claims, such statements are insufficient as a matter of

law to give rise to the requisite special relationship between Plaintiffs and

Oxendine necessary to state a negligent misrepresentation claim against Bank of

America.   Accordingly, the Court **RECOMMENDS** that the District Court grant

the Motion to Dismiss as to the negligent misrepresentation claim.

### F.    North Carolina Deceptive Trade Practices Act

#### 1.    Choice of law

Defendant contends that the Court should dismiss the UDTPA claim because

North Carolina law does not apply to Plaintiffs claim.[5]  As a threshold matter, the

Court need not decided this issue at this time because even if the Court were to

agree with Defendant that North Carolina law did not apply, the Court would not

recommend that the District Court dismiss the UDTPA claim.  Instead, the Court

would apply the substantive law of the proper jurisdiction and determine whether

the Amended Complaint states a claim under that state's relevant consumer

protection statute.  Defendant, however, did not address which state's law would

apply to the claim and did not address whether or not the Amended Complaint

states a claim under that state's law.  As such, the Court need not address the

choice of law issue at this time.

---

5   Curiously, Defendant does not argue that North Carolina law does not apply to the other state law torts claims, only the UDTPA claim.

Moreover, there is insufficient evidence before the Court at this time to resolve the choice of law issue.  In order to settle a choice of law issue for a tort claim, North Carolina courts apply the *lex loci delicti* rule.  Coleman, 887 F. Supp. 2d at 669; United Dominion Indus., Inc. v. Overhead Door Corp., 762 F. Supp. 126, 129 (W.D.N.C. 1991) (Mullen, J.); Harco Nat'l Ins. Co. v. Grant Thornton LLP, 698 S.E.2d 719, 724-25 (N.C. Ct. App. 2010).  This rule requires the Court to determine the state where the injury occurred and apply the law of that state.  Boudreau v. Baughman, 368 S.E.2d 849, 854 (N.C. 1988); Harco Nat'l, 698 S.E.2d at 724; Dominion Indus., 762 F. Supp. at 129.  A plaintiff's injury occurs in the state where the last act giving rise to the alleged injury occurs.  Harco Nat'l, 698 S.E.2d at 724; United Virginia Bank v. Air-Lift Assocs., Inc., 339 S.E.2d 90, 94 (N.C. Ct. Ap. 1986); Dominion Indus., 762 F. Supp. at 130-31.  Such an approach is consistent with Coleman, which held that North Carolina law applied to claims asserted by South Carolina residents who bought lots at a development in North Carolina because the property was located in North Carolina and the real estate transaction was completed in North Carolina.  877 F. Supp. 2d at 569.[6]

Here, the last act giving rise to the alleged injury is the real estate closing,

_____

6   The Court recognizes that in Feeley, the Eastern District of Virginia determined that the law where plaintiffs resided applied because that was the location of the financial injury.  660 F. Supp. 2d at 713.  The Court in Feeley, however, was applying Virginia law.  Id.  Moreover, in light of  Coleman, Dominion Indus., and the decisions of the North Carolina Court of Appeals, this Court could not recommend a similar result in this case.

which finalized the purchase of the River Falls lot. Although the lots are in North Carolina, the Amended Complaint does not allege where the closing occurred. Absent such evidence, the Court cannot make a determination as to what state's law applies to the claim. Accordingly, the Court **RECOMMENDS** that the District Court deny without prejudice the Motion to Dismiss [# 38] to the extent it moves to dismiss the UDTPA claim for failing to alleges a factual basis for applying North Carolina law. At the summary judgment stage the Court will address what state's laws govern the UDTPA claim, as well as the other state law torts, and apply the relevant state's law to the remaining tort claims asserted by Plaintiffs.

2. The North Carolina Unfair and Deceptive Trade Practices Act

In the alternative, Defendant contends that the Court should dismiss the UDTPA claim because Plaintiffs have not alleged facts stating a claim under North Carolina law. In order to make out a *prima facie* claim for unfair and deceptive trade practices, Plaintiffs must show that: (1) Defendant committed an unfair or deceptive act or practice; (2) that this act or practice was in or affecting commerce; and (3) that the act or practice proximately caused the Plaintiffs' injury. Gray v. N.C. Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000); Hospira Inc. v. Alphagary Corp., 671 S.E.2d 7, 12 (N.C. Ct. App. 2009); Sessler v. March, 551

S.E.2d 160, 167 (N.C. Ct. App. 2001). A practice is unfair if it "'is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers.'" Thompson, 418 S.E.2d at 699 (quoting Johnson v. Phoenix Mut. Life Ins. Co., 266 S.E.2d 610, 621 (N.C. 1980)); Sessler, 551 S.E.2d at 167. A practice is deceptive where it has the tendency or capacity to deceive. Thompson, 418 S.E.2d at 699; Sessler, 551 S.E.2d at 167. "In making a claim of unfair and deceptive trade practices on a theory of misrepresentation or fraud, a plaintiff must show that a defendant's words or conduct possessed 'the tendency or capacity to mislead' or create the likelihood of deception.'" Hospira, 671 S.E.2d at 12 (quoting Marshall v. Miller, 276 S.E.2d 397, 403 (1981)). Moreover, a plaintiff does not have to show actual deception to prevail, he or she need only demonstrate that the acts of defendant "possessed the tendency or capacity to mislead or create the likelihood of deception." RD & J Props. v. Lauralea-Dilton Enters., LLC, 600 S.E.2d 492, 500-501 (N.C. Ct. App. 2004).

The Amended Complaint contains sufficient factual allegations supporting the UDTPA claim, including that alleged misrepresentations by Oxendine regarding the future price increases of the developer owned lots, the fact that the sales agents would sell Plaintiffs' lot first because they were clients of Tarins, and the value of the lot. Accepting the factual allegations in the Amended Complaint

as true, these alleged misrepresentations had the "capacity to mislead" potential purchasers like Plaintiffs.  See RD & J Props., 600 S.E.2d at 500-501.  "Moreover, proof of fraud necessarily constitutes a violation of the prohibition against unfair and deceptive acts."  Karp, 887 F. Supp. 2d at 688 (internal quotation and citation omitted).   Accordingly, the Court **RECOMMENDS** that the District Court deny the Motion to Dismiss as to the unfair and deceptive trade practices claim.

## IV.    Conclusion

The Court **RECOMMENDS** that the District Court **DENY without prejudice** the Motion to Dismiss [# 38] to the extent it moves to dismiss the UDTPA claim for failing to alleges a factual basis for applying North Carolina law and to the extent it moves to dismiss all the claims as time barred under the applicable statute of limitations.  The Court **RECOMMENDS** that the District Court **GRANT** the Motion to Dismiss [# 38] as to the negligent misrepresentation claim.  As to the remaining claims, the Court **RECOMMENDS** that the District Court **DENY** the Motion to Dismiss [# 38].

Signed: August 28, 2013

Dennis L. Howell
United States Magistrate Judge

## **Time for Objections**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).